IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JIM DEAN WOLFENBARGER,

          Plaintiff,                   No. CIV S-03-2417 MCE EFB P

    vs.

VIRGINIA BLACK, SHERIFF, et al.,

          Defendants.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

    Plaintiff is an individual held pursuant to civil commitment as a sexually violent predator ("SVP") who is suing for alleged civil rights violations. *See* 42 U.S.C. § 1983.  He challenges the conditions of his confinement.  His August 18, 2005, second amended complaint claims that defendants (1) exposed him to a known risk of substantial harm; (2) denied him adequate medical care; (3) subjected him to unsanitary and unhygienic conditions of confinement; (4) restricted his visitation privileges; (5) subjected him to punitive conditions of confinement; (6) forced him to submit to unreasonable searches; (7) denied him his right to freely associate and peaceably assemble; (8) interfered with his right of access to the court; (9) deprived him of liberty and property without due process of law; (10) deprived him of equal protection of the law; and (11) subjected him to Ex Post Facto and Double Jeopardy violations.  Before the court

////

is defendants' May 29, 2007, motion for summary judgment.[1]  The motion attacks all but plaintiff's first four claims for relief.

## I.    Background

The SVP Act defines an SVP as a person "convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others" i.e., is "likely [to] engage in sexually violent criminal behavior."  *See* Cal. Welf. & Inst.Code § 6600(a).  At least six months before a person who has committed the predicate offenses is to complete his sentence, he is evaluated by the Department of Corrections and Department of Mental Health.  *Id*., § 6601.  If those two departments agree that the person evaluated may be an SVP, a petition for commitment may be filed by the district attorney or counsel for the county in which the evaluated person was convicted.  *Id., § 6601(I).  If that person is found by a jury to be an SVP who poses a danger to the health and safety of others, he is civilly committed for an indefinite period to commence after his criminal sentence is fulfilled.  *Id.* §§ 6602-6604; *Hydrick v. Hunter*, 466 F.3d 676 (9th Cir. 2006); *see also Hubbs v. Alamao*, 360 F.Supp.2d 1073 (C.D. Cal. 2005).

Once an SVP petition is filed, "it is reviewed by a superior court judge to determine whether it 'states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release.'"  *Cooley v. Superior Court (Marentez)*, 29 Cal.4th 228, 244-45 (2002) (quoting Cal. Welf. & Inst.Code § 6601.5).  If the superior court judge determines the petition supports a finding of probable cause, the judge orders the person detained pending the probable cause hearing.  *Id*., at 245.  At the probable cause hearing, the superior court determines "whether there is probable cause to believe that the individual named in the

_____

[1]  Defendants Stemens and Cassidy filed an answer to the complaint on January 7, 2008, and have not joined in the motion.

2

1 petition is likely to engage in sexually violent predatory criminal behavior upon his or her

2 release." Cal. Welf. & Inst.Code § 6602(a); *People v. Hurtado*, 28 Cal.4th 1179, 1182-83, 124

3 (2002), *cert. denied*, 538 U.S. 963 (2003).  If the superior court finds there is probable cause, the

4 person is detained until a trial is conducted "to determine whether the person is, by reason of a

5 diagnosed mental disorder, a danger to the health and safety of others in that the person is likely

6 to engage in acts of sexual violence upon his or her release from the jurisdiction of the

7 Department of Corrections or other secure facility."  Cal. Welf. & Inst. Code § 6602(a).

8       At trial on the civil commitment petition, "the defendant is entitled to a jury, the

9 assistance of counsel, and the right to retain experts to perform further evaluations." *People v.*

10 *Torres*, 25 Cal.4th 680, 683 (2001); Cal. Welf. & Inst.Code § 6603(a).  If the person is found to

11 be a sexually violent predator, "the person shall not be kept in actual custody longer than two

12 years unless a subsequent extended commitment is obtained from the court incident to the filing

13 of a petition for extended commitment . . . ."  Cal. Welf. & Inst.Code § 6604.  Before an SVP

14 can be recommitted under the Act, he is entitled to a jury trial, the assistance of counsel, and the

15 right to retain experts, and "the trier of fact must find, beyond a reasonable doubt, that the

16 [individual] is likely to commit sexually violent predatory behavior upon his release." *Hurtado*,

17 28 Cal.4th at 1182 (emphasis in original); Cal. Welf. & Inst.Code §§ 6603-04.

18 **II.**     **Summary of Facts Relevant to the Summary Judgment Motion**

19     The events giving rise to the allegations in plaintiff's second amended complaint

20 occurred during three specific time periods while he was temporarily housed in the Yuba County

21 Jail for recommitment proceedings pursuant to the SVPA.

22       **A.  Plaintiff's First Period of Incarceration:  July 10, 2002, to December 23, 2002.**

23     On July 10, 2002, plaintiff was transferred from Folsom State Prison to the Yuba County

24 Jail ("County Jail").  He remained there until December 23, 2002.  Defs.' Stmt. of Undisp. Fact

25 ("SUF"), ¶¶ 1, 6.  Prior to his placement at the County Jail, he was serving a 27-year sentence

26 ////

1  at Folsom State Prison.  SUF, ¶ 3.[2]  He was placed at the jail to undergo commitment

2  proceedings under Cal. Welf. & Inst. Code § 6600 (also known as California's Sexually Violent

3  Predator Act).  SUF, ¶ 4.[3]  He arrived there five days prior to being officially paroled from

4  Folsom State Prison on July 15, 2002.  SUF, ¶ 2.  As such, he remained a penal inmate for those

5  five days.

6          Plaintiff claims that, after his probable cause hearing in superior court, he was strip-

7  searched.[4]  *Id.*, ¶ 5.  Defendants' explanation for the strip-search is that inmates entering the jail

8  have ample opportunity to bring in contraband from other sources unknown to jail staff.  Decl. of

9  Jerry Parker ("Parker Decl."), ¶ 5.  Plaintiff contends that this concern does not apply to him

10  because he was being transferred from a maximum security facility and was frisked by

11  transporting officers, and made to surrender all of his property to the deputies.  Pl.'s Opp'n to

12  Defs.' Stmt. of Undis. Facts ("Pl.'s Opp'n SUF"),  ¶31.  If contraband is brought into the jail, it

13  poses a security risk for other inmates and staff.  SUF, ¶ 32.  Visual strip-searches are effective

14  both in detecting contraband and deterring inmates from bringing contraband into the jail.  SUF,

15  ¶ 33.  Further, visual strip-searches reveal contraband concealed in areas where pat search

16  techniques would not, including areas on the body and within the clothing itself.  SUF, ¶ 34.

17  ////

18  _____

19          [2] Plaintiff objects to defendants' recitation of the facts of his commitment offense as
     prejudicial.  Those facts are not in issue here.  Moreover, it appears that the facts were provided
20  solely as background information and not offered as evidence in support of this motion.
     Accordingly, they are not relevant to this motion and are not considered here.

21          [3] Plaintiff objects to the use of his deposition testimony because defendants did not
22  provide him with a transcript of it.  The objection is overruled.  Under Federal Rule of Civil
     Procedure, Rule 30(f)(3), "[w]hen paid reasonable charges, the officer must furnish a copy of the
23  transcript or recording to any party or the deponent."  It is not defendants' obligation to provide
     plaintiff, at their expense, a copy of his deposition transcript.  He does not state that he was
24  unable to review his deposition transcript for error, and does not claim that he made payment for
     a personal copy.  Instead, he claims that he asked for a copy and, despite previously agreeing
25  otherwise, defense counsel did not provide him with one.

26          [4] Plaintiff also generally alleges that defendant Yang subjected him to strip-searches.
     Compl., 11: 9-14.

1     After being strip-searched, plaintiff was placed in "A" Pod.  *Id.*, ¶ 5.  "A" Pod is

2   administrative segregation.[5]  Administrative segregation houses pre-classification inmates,

3   protective custody inmates, and inmates with disciplinary problems.  SUF, ¶ 8.  Defendants state

4   that when plaintiff was first booked into the jail on July 10, 2002, he was classified as

5   "protective custody" and placed in administrative segregation because, based on his history, he

6   could have been targeted by other inmates.  Decl. of Deputy Stephen Houston ("Houston

7   Decl."), ¶ 5.

8     While plaintiff was in administrative segregation, he received the same privileges as all

9   other inmates in administrative segregation.  SUF, ¶ 14.  Each cell was open for 45 minutes a

10  day, during which the occupants of the cell would be led out to the day room for showers and

11  phone calls.  *Id.*, ¶ 32.  Plaintiff was given 45 minutes of dayroom access per day while housed

12  in administrative segregation.  *Id.*, ¶¶ 31, 32.  It is undisputed that all inmates in administrative

13  segregation receive equal time outside their cells in the dayroom and on the roof.  SUF, ¶ 12.

14    However, plaintiff claims that while housed in "A" Pod, he was denied the privileges

15  provided to inmates housed in other areas of the jail.  *Id.*, ¶ 52.  He claims that the amount of

16  time an inmate was allowed outside of the cell was directly related to the inmate's relationship to

17  the officer on duty.  Plaintiff also disputes defendants' statement that there was equal treatment

18  of inmates in access to the roof exercise area.  However, his explanation shows that the dispute is

19  not genuine.  Rather, he really disputes whether the facility itself is adequate, not whether he was

20  provided equal access to it.  Pl.'s Opp'n SUF, ¶ 11.  Defendants assert that there was no

21  favoritism in roof and day room access because any favoritism poses security concerns of

22  increased fighting between inmates and the staff.  Houston Decl., ¶ 6.

23  _____

24    [5] Neither of the parties specifically describe the housing classification for "A" Pod.
    Housing in "A" Pod appears to be administrative segregation.  Plaintiff states alternatively in his
    declaration that he was housed in "A" Pod and administrative segregation.  See Pl.'s Decl. A, ¶
25  52.  Also, plaintiff states that he was placed in administrative segregation in "A" Pod in ¶ 39 of
    his Declaration of Events from November 2003 to February 2004 ("Pl.'s Decl. B"), Attached to
26  Second Amended Complaint, as discussed below.

From December 12 to December 23, 2002, plaintiff was housed in the same cell with a California Department of Corrections prisoner who had been brought to Yuba County for a court date.  Houston Decl., ¶ 6; SUF, ¶ 17.  After a couple of weeks, another Department of Corrections inmate was housed in the same cell with plaintiff, for a period of fourteen days.  Houston Decl., ¶ 15.  Plaintiff claims that while he was housed with these inmates he was unable to possess any of his documents from court due to personal safety and security concerns.  Pl.'s Sec. Am. Compl., Decl. A attached thereto ("Pl.'s Decl. A"), ¶ 21.

From August 8, 2002, to December 14, 2002, plaintiff was single-celled.  *Id.*, ¶ 29.  He claims that he had extensive contact and was in close proximity with other inmates during his incarceration at the County Jail.  SUF, ¶ 65.

Plaintiff claims that he was denied all access to the law library during his first period of incarceration.  Pl.'s Decl. A, ¶ 41.  Consequently, he was unable to assist the attorney who represented him in his commitment proceedings.  SUF, ¶ 40.  He also alleges that on account of being denied law library access, he was unable to cite authority with the grievances he filed in the County Jail.  SUF, ¶ 42.

Plaintiff complains that his legal mail was opened outside his presence during his incarceration at the County Jail.  Compl., 27:19-24.  Defendants claim that jail officials only open legal mail in front of the inmate in order to check for contraband.  Decl. of Mark Chandless ("Chandless Decl."), ¶ 7.  Jail officials do not read the content of the mail.  *Id.*  Defendants state that if the mail has even the slightest indication that it might be legal mail, jail officials err on the side of caution and open the mail in the presence of the inmate.  *Id.*  Further, they claim that if plaintiff's legal mail was ever opened outside his presence, it would have been accidental or the legal mail was not labeled properly.  *Id.*

Plaintiff claims that he was never allowed confidential use of a telephone to speak openly with his family or attorney, because calls were monitored by jail staff and could be overheard by other inmates in the Pod.  Pl.'s Decl. A, ¶ 35.  Defendants dispute this and state that between

1    July 2002, and April 2005, telephone calls made or received at the County Jail were not

2    monitored or recorded.  Chandless Decl., ¶ 8.

3        Plaintiff requested pastoral visits with Hank Hanson.  SUF, ¶ 45.  While in state prison,

4    plaintiff became a Jehovah's Witness.  Pl.'s Decl. A, ¶ 43.  He was told by staff that other

5    inmates were allowed to attend services with Jehovah's Witnesses, but because plaintiff was

6    housed in "A" Pod, he was not allowed to attend.  *Id.*  Therefore, an Elder, Mr. Hank Hanson,

7    made himself available for pastoral visits.  *Id.*

8        Defendants Chandless and Downs refused to allow plaintiff to have pastoral visits with

9    an Elder of his faith.  Pl.'s Decl. A, ¶ 42.  Inmates are allowed pastoral visits from professional

10   members of the clergy if they minister to a congregation or church.  SUF, ¶ 46.  Generally, jail

11   officials request a letter of introduction from the represented religion outlining the prospective

12   professional clergy member's education, ordained status, certification, and past and present

13   responsibilities, including but not limited to administering weddings or funeral services.  SUF,

14   ¶ 47.

15       When Mr. Hanson applied for pastoral visits, he had an interview with defendant Downs,

16   who stated, "It has been my experience that anyone can become an Elder.  You haven't been to

17   seminary or anything like that, so I'm not going to let you come in."  Pl.'s Decl. A, ¶ 44.  Mr.

18   Hanson told defendant Downs that he had in fact completed training courses that all Elders of the

19   Jehovah's Witness faith must complete, and that only Catholics attend Seminary Schools.  *Id.*,

20   ¶ 45.

21       Defendant Downs states that Mr. Hanson informed him that he was a close friend of

22   plaintiff and plaintiff's family for several years and denied pastoral visits on that basis.  Decl. of

23   Lieutenant Jim Downs ("Downs Decl."), ¶ 6.  Defendant Downs states that there is a conflict of

24   interest if the clergy member is a long-time personal friend of the inmate because jail officials do

25   not know whether they are visiting as clergy or as a friend.  *Id.*  Plaintiff disputes this

26   characterization of his relationship with Mr. Hanson, stating that before he entered the County

7

1   Jail he did not know Mr. Hanson, and if Mr. Hanson did state that he was a personal friend of

2   plaintiff's, it was only later, after having visited him at the jail over the course of years.  Pl.'s

3   Opp'n SUF, ¶ 48.  Plaintiff further objects, stating that he "cannot see the conflict of interest if a

4   clergy is a friend of the inmate in that the nature of the relationship between a person and their

5   religious representative is one that, if they were not friends before, they soon will be."  Pl.'s

6   Opp'n SUF, ¶¶ 50-59.

7           Defendant Downs asked Mr. Hanson to give him the names of local clergy members

8   from his denomination for plaintiff.  SUF, ¶ 56.  Defendants claim that Mr. Hanson gave

9   defendant Downs one name, and defendant Downs called that person several times to inquire as

10  to his ability to visit plaintiff at the County Jail.  Downs Decl., ¶ 6.  Defendant Downs' calls

11  were not returned.  *Id.*  Plaintiff disputes this, stating that he and Mr. Hanson informed

12  defendants that Jehovah's Witnesses were in the phone book.  Pl.'s Opp'n SUF, ¶¶ 56-58.

13  Defendants state that at no time did plaintiff request pastoral visits from anyone other than Hank

14  Hanson.  Downs Decl., ¶ 6.  Plaintiff disputes this, stating that he had also been granted pastoral

15  visits with a "Brother" Victor Cruze.  Pl.'s Opp'n SUF, ¶ 59.

16          Plaintiff complains that although he had personal visits, they were not contact visits but

17  only "glass" visits.[6]  SUF, ¶ 67.  Plaintiff's visits with Mr. Hanson were to be held in non-contact

18  visiting booths.  Pl.'s Decl. A, ¶ 43.  This visitation area is open to the public.  *Id.*, ¶ 46.  Mr.

19  Hanson was permitted to visit during plaintiff's regular visiting hours.  Downs Decl., ¶ 6.

20  Defendants cite to plaintiff's deposition testimony to support the claim that Mr. Hanson regularly

21  visited plaintiff during plaintiff's personal visits.  Decl. of Lara Wallman, Ex. F, Pl.'s Dep.

22  ("Pl.'s Dep."), 71:2-14, 100:4-15, 119:20-120:6.   Defendants also claim that plaintiff indicated

23  that when Hank Hanson would visit, they would engage in prayer.  Pl.'s Dep., 71:20-24, 104:13-

24  21.  Defendants further claim that plaintiff was permitted to study religion on his own, and to

25  _____

26      [6]  Apparently, plaintiff is referring to visits in which he was separated from his visitors by
    a glass partition.

1  attend other religious services.  *Id.*, 72:14-73:8, 104:22-105:22.  Plaintiff disputes these claims.

2  His deposition testimony was, in fact, that Mr. Hanson came to visit him four times, at the most,

3  during his first six-month period of incarceration, during which times they did not have any

4  official religious study or pray together.  *Id.*, 71:2-14.  He also testified that Mr. Hanson brought

5  his wife and daughter to meet with plaintiff at the jail as many as two times, once when

6  plaintiff's family was visiting as well.  *Id.*, 100:4-15.

7        Defendants cite plaintiff's testimony that Mr. Hanson attended plaintiff's civil

8  commitment jury trial, but plaintiff testified that they "never had the opportunity to really

9  dedicate a visit" to spiritual study.  Pl.'s Dep. 119:20-120:6.  Plaintiff was invited to join Sunday

10 Services but could not attend because of religious reasons.  *Id.*, 72:16-18.  He occasionally

11 received Watchtower magazines published for his particular religion.  *Id.*, 72:25-73:8.  He heard

12 there was someone coming into the jail for Jehovah's Witnesses meetings, but when he asked

13 they would say no and instead offer him Catholic services.  *Id.*, 105:12-25.

14       Plaintiff filed a grievance in response to defendant Downs' denial of Mr. Hanson's

15 request for pastoral visits.  He asserts that defendant Downs told him that his captain (Captain

16 Chandless) agreed with his decision to deny pastoral visits.  Pl.'s Decl. A, 47.  He could have

17 used his personal visits to engage in religious activity.  Pl.'s Dep., 120:10-24.  He contends,

18 however, that he could not hold regular religious services with Mr. Hanson during personal

19 visiting hours because he had no way of knowing if his family was going to be visiting on a

20 given day and so could not schedule accordingly.  Pl.'s Opp'n SUF, ¶ 53.  He also states that the

21 visiting area during regular scheduled visiting days is an inappropriate location because of the

22 noise and distractions.  *Id.*

23        On or about December 12, 2002, plaintiff was ultimately found to meet the criteria

24 under Cal. Welf. & Inst. Code § 6600, and was committed to Atascadero State Hospital ("ASH")

25 ////

26 ////

9

1  for two years.  SUF, ¶ 5[7]; Pl.'s Dep., 25:11-12; Pl.'s Decl. A, ¶ 53.

2  **B.    Plaintiff's Second Period of Incarceration: November 19, 2003, to February 2004.**

3

4  On November 19, 2003, plaintiff was again booked into the jail after transfer from ASH.

5  Pl.'s Sec. Am. Compl., Decl. B attached thereto ("Pl.'s Decl. B"), ¶¶ 1, 20.  Plaintiff was placed

6  into administrative segregation for criminal commitments in "A" Pod in the jail.  *Id.*, ¶ 39.

7  Plaintiff immediately filed a grievance about his housing situation.  *Id.*, ¶ 40.

8  Plaintiff was informed that as a prisoner he was required to submit to a tuberculin ("TB")

9  skin test.  *Id.*, ¶ 54.  Plaintiff stated that he had just taken a TB test for the Department of Mental

10  Health as is required every year, and refused the skin test.  *Id.*  Thereafter, plaintiff was placed in

11  a cell in the medical unit.  *Id.*, ¶ 55.  Plaintiff claims that the medical unit houses prisoners with

12  contagious diseases, but also those who are being punished for breaking jail regulations.  *Id.*

13  After filing several grievances, Captain Chandless came to plaintiff's cell to talk with

14  him about some of the issues that he had raised.  *Id.*, ¶ 57.  He told plaintiff, "All I care about is

15  that I have an order to produce you for court.  It doesn't matter to me if you are civil or have a

16  dozen felonies, you are a prisoner and this is where I am going to house you."  *Id.*, ¶ 58.  Once

17  again, plaintiff said that he was being denied privileges that were being afforded other prisoners

18  in the jail.  *Id.*, ¶ 59.  Chandless stated, "[y]ou have the same privileges as the other prisoners put

19  in these [medical unit] cells."  *Id.*, ¶ 60.  Plaintiff further protested that he was being denied

20  rights to privacy, to send and receive unopened mail, and to place and receive unmonitored

21  phone calls.  *Id.*, ¶ 64.  Chandless responded, "we are not denying your rights because you don't

22  have those rights."  *Id.*, ¶ 65.

23

24  [7] Defendants state that plaintiff was committed to ASH on December 10, 2002.  Plaintiff disputes this, stating that he was committed on December 12, 2002.  Further, plaintiff objects to defendants use of this fact, stating that "his commitment status has no direct bearing on the issues pertaining to this action."  On the contrary, his commitment status is at the heart of this litigation. It is his status as a civil detainee which gives rise to the claims in his complaint. Plaintiff's objection is overruled.

In response to a grievance that plaintiff filed regarding pastoral visits, defendant Downs came to plaintiff's cell. *Id.*, ¶ 66. Downs said he would never allow plaintiff to have pastoral visits by Jehovah's Witnesses, that he was "not having some fly-by-night, want to be religious leaders who are mechanics by day and Holy by night coming into my jail." *Id.*, ¶¶ 67, 68.

The following day, when plaintiff asked for his hallway time, a deputy let him out of his cell and told him he was sorry, but Lieutenant Downs told him to lock his cell door behind him when he came out for his hallway time, but that none of the other prisoners would have their doors locked. *Id.*, ¶¶ 72, 73. The deputy returned about a half hour later and said that he told his Corporal about it and his Corporal told him that it wasn't right to keep plaintiff's cell door locked and to go back and unlock his door. *Id.*, ¶ 74.

Between the months of November 2003, and February 2004, plaintiff was returned to ASH and brought back to the jail several times. *Id.*, ¶ 76. On February 24, 2004, plaintiff was again brought back to jail from ASH. *Id.*, ¶ 85. He was ordered to strip for a body cavity search. *Id.*, ¶ 86. He told the deputy that he was a civil commitment detainee and should not be strip-searched. *Id.* Defendant Adams said, "I know you are a Civil Commitment but because of your past crimes you are forever a criminal and I have the right to search you whenever I wish." *Id.*, ¶ 87. Plaintiff then agreed to be searched, but only with his lawyer present. *Id.*, ¶ 88. Adams then said "It's 2:30 a.m. We're not going to wake up your lawyer." *Id.*, ¶ 89. Plaintiff said he would wait until his lawyer could be present. *Id.*, ¶ 90. Adams said "fine" and placed him in a small holding cell with a concrete bench. *Id.*, ¶ 91. Plaintiff asserts that, after several hours, the pain of trying to lay on the narrow concrete bench became so acute that plaintiff agreed to the strip-search. *Id.*, ¶ 91. At 6:30 a.m., plaintiff was searched and placed in a cell in the medical unit. *Id.*, ¶ 92. Plaintiff claims that defendant Parker performed this particular strip-search at the direction of defendant Adams. Compl., 12:5-16, 7:22-27.

That same day, plaintiff was scheduled for visits, but his visitors were turned away after having driven several hours to get to the jail. *Id.*, ¶ 93. Plaintiff later learned that because he

1   had originally refused the strip-search, his visiting privileges would be denied for 30 days. *Id.*

2   Plaintiff informed staff that his visits were not a privilege but a right that could not be denied,

3   but that fell on deaf ears. *Id.*, ¶ 94. Shortly thereafter, plaintiff was returned to ASH, where he

4   remained until December 20, 2004. *Id.*, ¶ 95.

5   **C. Plaintiff's Third Period of Incarceration: December 20, 2004, to April 29, 2005.**

6   On December 20, 2004, plaintiff was once again transferred to the jail and placed in a

7   cell in the medical unit. SUF, ¶ 19; Pl.'s Sec. Am. Compl., Decl. C attached thereto ("Pl.'s Decl.

8   C"), ¶¶ 1, 2. Plaintiff states that the County made no effort to house plaintiff in the "civil"

9   section of the jail, though ordered to. *Id.*, ¶ 3.

10  The medical unit houses protective custody inmates, inmates with mental health issues,

11  and inmates with disciplinary problems. SUF, ¶ 20. The medical unit is more protective than

12  administrative segregation because the cell doors do not have bars that could allow penetration

13  from the outside. SUF, ¶ 21. Instead, the cell doors cannot be penetrated from the outside.

14  SUF, ¶ 22. The medical unit consists of four single cells and a hallway with a telephone and

15  shower. SUF, ¶ 23. All inmates in the medical unit receive equal time outside their cells in the

16  hallway, and on the roof. SUF, ¶ 24. It is undisputed that while plaintiff was in the medical unit,

17  he received the same privileges as all the other inmates in the medical unit. SUF, ¶ 26.

18  However, plaintiff has submitted testimony from another SVP detainee, housed with plaintiff at

19  the jail, that he received privileges denied to plaintiff for no apparent reason. Pl.'s Opp'n to

20  Defs.' Mot. for Summ. J., Ex. A, Decl. of Robert Barbour ("Barbour Decl."), ¶¶ 1, 4-7.

21  Additionally, plaintiff states that the medical unit only had a hallway, unlike "A" Pod, where

22  there was a table and a television. Pl.'s Dep., 94:6-12.

23  Plaintiff's requests to he housed in "Q-3," in a single cell in another part of the jail, were

24  denied. Pl.'s Decl. C, ¶ 19. The Q-3 cell has a television, which would at least return that

25  privilege to him. *Id.*, 20. This same cell is routinely used to house civil commitments, but only

26  seems to be restricted to plaintiff. *Id.*, ¶ 21.

Plaintiff was again denied the right to practice his religious beliefs, because the Elders of the Jehovah's Witness faith were turned away and his pastoral visits refused. *Id.*, ¶¶ 22, 23. Defendants Downs and Chandless have denied the Elders access for not having attended seminary school, which is associated with Catholicism, and for not being pastors presiding over their own congregations. *Id.*, ¶¶ 25, 26. Defendants Downs and Chandless also denied his pastoral visits because the Elder knows plaintiff and is a friend of the family. *Id.*, ¶ 27. Plaintiff's mother and sister are in the same congregation with this Elder, but his relationship to plaintiff is based upon the Elder's role in the congregation. *Id.* The denial of visitation with these Elders caused plaintiff immense and irrevocable harm, as it is through meeting and discussion that the faith is experienced. *Id.*, ¶¶ 28- 38.

On March 31, 2005, plaintiff was finally allowed access to the law library. SUF, ¶ 43. However, his visits to the law library did not assist him in any case, including his second commitment proceeding. SUF, ¶ 44. The law library is seriously outdated, with no typewriter or legal materials or references published more recently than 1992. Pl.'s Decl. C, ¶ 43.

Plaintiff has written many grievances stating his rights as a civil detainee and has asked to be treated at least as well as the criminal inmates in the jail. *Id.*, ¶ 45. All of his grievances have been denied or ignored and he has been placed in the most restrictive area in the jail and given the privileges equal to the most severe punishment given at the jail. *Id.*, ¶ 46. Criminal inmates at the jail have all-day access out of their cells and have access to phones, exercise, television and DVD players. *Id.*,¶ 47. Each week they are given treats in the form of popcorn, ice cream, and sodas. *Id.* They are allowed to go to school, vocational training, religious services, and hold "trustee" positions. *Id.* Plaintiff was denied all of these privileges. *Id.* Even plaintiff's request to have his door open during the 20 hours available when the criminal inmates housed in the medical area are not out for hallway time has been denied to plaintiff. *Id.*, ¶ 48.

On April 29, 2005, plaintiff was returned back to Atascadero State Hospital. *Id.*, ¶ 64.

////

1   **III.     Summary Judgment Standards Under Rule 56**

2   Summary judgment pursuant to Fed. R. Civ. P. 56(a) avoids unnecessary trials in cases

3   with no disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of*

4   *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a

5   sufficient disagreement to require submission to a jury or whether it is so one-sided that one

6   party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

7   (1986).  Rule 56 serves to screen the latter cases from those which actually require resolution of

8   genuine disputes over facts material to the outcome of the case; e.g., issues that can only be

9   determined through presentation of testimony and evidence at trial such as credibility

10  determinations of conflicting testimony over dispositive facts.

11              In three recent cases, the Supreme Court, by clarifying what the
               non-moving party must do to withstand a motion for summary
12              judgment, has increased the utility of summary judgment. First, the
               Court has made clear that if the non-moving party will bear the
13              burden of proof at trial as to an element essential to its case, and
               that party fails to make a showing sufficient to establish a genuine
14              dispute of fact with respect to the existence of that element, then
               summary judgment is appropriate.  *See Celotex Corp. v. Catrett*,
15              477 U.S. 317 (1986).  Second, to withstand a motion for summary
               judgment, the non-moving party must show that there are "genuine
16              factual issues that properly can be resolved only by a finder of fact
               because they may reasonably be resolved in favor of either party."
17              *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis
               added).  Finally, if the factual context makes the non-moving
18              party's claim implausible, that party must come forward with more
               persuasive evidence than would otherwise be necessary to show
19              that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
               Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
20              argued that *any disagreement* about a material issue of fact
               precludes the use of summary judgment.

21

22  *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

23  *denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no

24  "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

25  establish the existence of an element essential to that party's case, and on which that party will

26  bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

Thus, to overcome summary judgement an opposing party must show a dispute that is both genuine, and involving a fact that makes a difference in the outcome.[8] Two steps are necessary. First, according to the substantive law, the court must determine what facts are material. Second, in light of the appropriate standard of proof, the court must determine whether material factual disputes require resolution at trial. *Id.,* at 248.

When the opposing party has the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). The moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex v. Cattret*, 477 U.S. 317, 323-24 (1986).

If the moving party meets its burden, the burden shifts to the opposing party to establish genuine material factual issues. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586. The opposing party must demonstrate that the disputed facts are material, i.e., facts that might affect the outcome of the suit under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e., the parties' differing versions of the truth require resolution at trial, *see T.W. Elec.*, 809 F.2d at 631. There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex*, 477 U.S. at 323. The opposing party may not rest upon the pleadings' mere allegations or denials, but must present evidence of specific disputed facts. *See Anderson*, 477 U.S. at 248. Conclusory statements cannot defeat a properly supported summary judgment motion. *See Scott v. Rosenberg*, 702 F.2d 1263, 1271-72 (9th Cir. 1983).

---

[8] On August 20, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

The court does not determine witness credibility.  It believes the opposing party's evidence, and draws inferences most favorably for the opposing party.  *See Anderson*, 477 U.S. at 249, 255.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).

If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

With these standards in mind, it is important to note that plaintiff bears the burden of proof at trial over the issue raised on this motion, i.e., whether the defendants acted with deliberate indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference" is an essential element of plaintiff's cause of action.  Therefore, to withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita,* 475 U.S. at 586 n.11.  The opposing party must demonstrate

1   that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under

2   the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec.*

3   *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

4   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

5   nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

6          In resolving the summary judgment motion, all reasonable inferences that may be drawn

7   from the facts placed before the court must be drawn in favor of the opposing party.  *See*

8   *Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the

9   opposing party's obligation to produce a factual predicate from which the inference may

10  reasonably be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D.

11  Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the

12  opposing party "must do more than simply show that there is some metaphysical doubt as to the

13  material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to

14  find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587

15  (citation omitted).

16         On July 15, 2005, the court informed plaintiff of the requirements for opposing a motion

17  pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d

18  952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*

19  *Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

20  **IV.    Legal Standards for Civil Rights Suits Brought by Civil Detainees**

21         As a civil detainee, the standard applicable to plaintiff's claims is not the "cruel and

22  unusual punishment" standard under the Eighth Amendment.  He is no longer being held as part

23  of a sentence for a criminal conviction.  Accordingly, "'the more protective fourteenth

24  amendment [substantive due process] standard applies to conditions of confinement when

25  detainees . . . have not been convicted' of a crime." *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir.

26  2004) (quoting *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (citing *Youngberg v.*

1   *Romeo*, 457 U.S. 307 (1982) (civilly committed individuals), and *Bell v. Wolfish*, 441 U.S. 520

2   (1979)).

3           The Fourteenth Amendment requires the government to do more
            than provide the "minimal civilized measure of life's necessities,"
4           *Rhodes [v. Chapman]*, 452 U.S. [337] at 347, 101 S.Ct. 2392, for
            non-convicted detainees. Rather, "due process requires that the
5           nature and duration of commitment bear some reasonable relation
            to the purpose for which the individual is committed." *Jackson v.*
6           *Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845 [] (1972).

7           The case of the individual confined awaiting civil commitment
            proceedings implicates the intersection between two distinct
8           Fourteenth Amendment imperatives. First, "[p]ersons who have
            been involuntarily committed are entitled to more considerate
9           treatment and conditions of confinement than criminals whose
            conditions of confinement are designed to punish." *Youngberg*,
10          457 U.S. at 321-22, 102 S.Ct. 2452.  Second, when the state
            detains an individual on a criminal charge, that person, unlike a
11          criminal convict, "may not be *punished* prior to an adjudication of
            guilt in accordance with due process of law.'"  *Bell*, 441 U.S. at
12          535, 99 S.Ct. 1861 (emphasis added); *see also Demery v. Arpaio*,
            378 F.3d 1020, 1029 (9th Cir.2004) ("[T]he Fourteenth
13          Amendment prohibits all punishment of pretrial detainees.").  As
            civil detainees retain greater liberty protections than individuals
14          detained under criminal process, *see Youngberg*, 457 U.S. at 321-
            24, 102 S.Ct. 2452, and pre-adjudication detainees retain greater
15          liberty protections than convicted ones, *see Bell*, 441 U.S. at 535-
            36, 99 S.Ct. 1861, it stands to reason that an individual detained
16          awaiting civil commitment proceedings is entitled to protections at
            least as great as those afforded to a civilly committed individual
17          and at least as great as those afforded to an individual accused but
            not convicted of a crime.

18

19  *Jones v. Blanas*, 393 F.3d at 931-932.

20          In *Jones*, where the plaintiff was, like plaintiff herein, an individual detained in a county

21  jail awaiting involuntary civil commitment proceedings under the SVPA, the Ninth Circuit found

22  "that the conditions of confinement for an individual detained under civil process but not yet

23  committed must be tested by a standard at least as solicitous to the rights of the detainee as the

24  standards applied to a civilly committed individual and to an individual accused but not

25  ////

26  ////

convicted of a crime." *Id.*, at 932.  While the *Jones* court noted that the Eleventh Circuit[9] has

held that it is unconstitutional for individuals awaiting involuntary civil commitment

proceedings to be held in jail at all, the Ninth Circuit did not venture as far.  It concluded that

"[a]t a bare minimum," such an individual cannot be subjected to conditions amounting to

punishment.  *Id.*, at 932 (citations omitted).

Because a person detained pending confinement under the SVPA is a civil detainee, "an

SVPA detainee is entitled to 'more considerate treatment' than his criminally detained

counterparts." *Id.* (citing *Youngberg*, 457 U.S. at 321-22 ("[W]hen a SVPA detainee is confined

in conditions identical to, similar to, or more restrictive than, those in which his criminal

counterparts are held, we presume that the detainee is being subjected to 'punishment.'") and

*Sharp v. Weston*, 233 F.3d 1166, 1172-73 (9th Cir. 2000) (*Youngberg* required that

those civilly confined at a commitment center must receive "more considerate" treatment than

inmates at a correctional center where the commitment center was located)).

In addition, "when an individual awaiting SVPA adjudication is detained under

conditions more restrictive than those the individuals would face following SVPA confinement,

we presume the treatment is punitive."  *Jones*, 393 F.3d at 933.

> In sum, a civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive. Under Bell and our circuit precedent, a restriction is "punitive" where it is intended to punish, or where it is "excessive in relation to [its non-punitive] purpose," *Demery*, 378 F.3d at 1028..., or is "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," *Hallstrom*, 991 F.2d at 1484.... With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment. Finally, to prevail on a Fourteenth Amendment claim regarding conditions of confinement, the confined individual need not prove "deliberate indifference" on the part of government officials.

[9] *See Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984).

1   *Jones*, 393 F.3d at 933-34.

2   **V.    Analysis**

3          To establish a claim under 42 U.S.C. § 1983, plaintiff must demonstrate that defendants,

4   acting under color of state law, deprived him of rights secured by the Constitution or federal

5   statute. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986).

6          **A. Punitive Conditions of Confinement**

7          Plaintiff claims that defendants violated his substantive due process rights by subjecting

8   him to punitive conditions of confinement.  During his first period of incarceration, he was not

9   officially paroled from Folsom State Prison until five days after his arrival at the County Jail.

10  SUF, ¶ 2.  He was, therefore, a penal inmate for those five days.  After those five days he became

11  a civil detainee awaiting commitment proceedings.  Therefore, plaintiff's claims regarding his

12  first period of incarceration must be analyzed under the Eighth Amendment for the first five days

13  and the Fourteenth Amendment for the remainder of the period.

14         Further, although plaintiff's claims of unconstitutional conditions as applied to a civil

15  detainee arise from the Due Process Clause of the Fourteenth Amendment rather than from the

16  Eighth Amendment prohibition against cruel and unusual punishment, *see Jones v. Blanas*, 393

17  F.3d at 931; *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986), the Eighth Amendment

18  "provide[s] a minimum standard of care for determining plaintiff's rights as a pretrial detainee."

19  *Jones v. Johnson*, 781 F.2d at 771.  Thus, regardless of plaintiff's status, the protections under

20  the Eighth Amendment provide an irreducible minimum that must be satisfied.

21         Plaintiff generally claims that being housed in administrative segregation and protective

22  custody in the medical unit subjected him to substantially more restrictive conditions than those

23  in general population.  Pl.'s Decl. C, ¶¶ 45-47, 52.  Defendants argue that holding SVP detainees

24  in jail rather than at treatment facilities while awaiting their commitment proceedings has been

25  upheld.  They rely on the Southern District of California's discussion *Munoz v. Kolender,* which

26  notes  "[t]he Untied States Supreme Court has upheld the constitutionality of housing individuals

who have been adjudicated SVPs within prison facilities, in segregated housing." *Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1143 (citing *Seling*, 531 U.S. 250, 261 (2001)).  As explained in *Munoz*, the mere housing of plaintiff in the County Jail does not violate the Fourteenth Amendment.

> . . . the detention scheme established by California's SVPA, like that of Washington and Kansas, is a civil process.  *See Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072 (1997).  The purpose of Munoz's court-ordered transfers to County Jail was to permit his participation in the judicial process, not to punish him.  *See McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017, 2027, 153 L.Ed.2d 47 (2002) (transfer of prisoner from medium security facility to less-desirable maximum security unit, when not intended to punish prisoner, "is too ephemeral and insubstantial" to trigger Due Process protections) (quoting *Meachum*, 427 U.S. at 228, 98 S.Ct. 2532).  Moreover, an allegation that a state law has been violated is insufficient, without more, to raise a federal constitutional claim cognizable under 42 U.S.C. § 1983.  The 'right' under the SVPA to be housed at Atascadero rather than in County Jail pending SVP judicial determination proceedings does not involve a federal constitutional right in and of itself, particularly as the United States Supreme Court has upheld confinement of SVPs in prison facilities in segregation confinement.  *See e.g., Hendricks*, 521 U.S. 346, 117 S.Ct. 2072; *see also Talhelm*, 85 Cal.App.4th at 408 n. 5, 102 Cal.Rptr.2d 150; *cf. Olim v. Wakinekona*, 461 U.S. 238, 244-48, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (prisoners have no constitutional right to be housed in any particular institution).  This court concludes legitimate purposes are served, without infringing a SVPA detainee's constitutional rights, by the fact of temporary transfer and holding in County Jail.

208 F. Supp. 2d at 1147-1148.  For the same reasons, plaintiff's civil confinement at the County Jail is not *per se* a violation of due process under the Fourteenth Amendment.

The next inquiry is whether the conditions of plaintiff's confinement were "reasonably related to a legitimate governmental objective." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  The objectives in *Bell* included insuring the detainee's presence at trial, maintaining jail security, and effective management of the detention facility.  *Id.,* at 539-40; *Jones*, 393 F.3d at 932. Upholding those goals as legitimate, the Supreme Court stated "restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting . . . ." *Bell*, 441 U.S. at 540.  This court's role in applying the standard is further tempered by the Supreme Court's admonition in *Youngberg v. Romeo* that "interference by the federal judiciary" with the internal operations of

1  institutions of confinement should be minimized, as there is "no reason to think judges or juries

2  are better qualified than appropriate professionals" in making decisions regarding the liberty

3  interests and safety of those confined. *Youngberg*, 457 U.S. at 322-323.

4          Plaintiff claims that he was not treated as well as the criminal inmates in the jail, who

5  were given all-day access out of their cells with attendant access to phones, exercise, television,

6  a DVD player, vocational training, and education, and who were also given weekly treats such as

7  popcorn, ice cream, and sodas. Pl.'s Decl. C., ¶¶ 45-47. However, it is undisputed that all

8  inmates in administrative segregation receive equal time outside their cells in the dayroom and

9  on the roof. SUF, ¶¶ 8, 12. It is also undisputed that while plaintiff was housed in the medical

10  unit he received the same privileges as all the other inmates in the medical unit. SUF, ¶ 26.[10]

11  Further, he was given the same dayroom and roof access privileges in the medical unit as he

12  received in administrative segregation. SUF, ¶ 27.

13          Plaintiff also complains that he did not receive additional, or extra privileges, as did a

14  fellow SVP detainee. Barbour Decl., ¶¶ 1, 4-7. He further claims that he was locked out of his

15  cell for a half hour at defendant Downs' direction, Pl.'s Decl. B, ¶ 72-74, and that he was not

16  housed in a cell with a television. Pl.'s Decl. C, ¶¶ 19-21. At most, he has shown minor

17  dispartate treatment based on reasons, or as he alleges, "favoritism" having nothing to do with

18  his status as a civil detainee. Where he establishes differences in conditions that are not *de*

19  *minimis*, they are amply justified by the need for a more protective environment in the medical

20  unit and in administrative segregation. Plaintiff has not established facts that show the

21  conditions in administrative segregation or in the medical unit, though different from those in

22  general population, were maintained absent the legitimate governmental objective of effective

23  management and security maintenance at the jail. Therefore, summary judgment must be

24

25          [10] Plaintiff also states, however, that housing in the medical cells results in a nearly total
    deprivation of privileges. Pl.'s Decl. C, ¶ 4. Plaintiff seems to be making this statement by
26  comparison with inmates housed in different areas of the jail.

1  granted on plaintiff's due process claim.

2      To establish that conditions of imprisonment violate the Eighth Amendment's prohibition

3  on cruel and unusual punishment, plaintiff must show a specific individual was deliberately

4  indifferent to some basic human need of his such as food, clothing, shelter, medical care or

5  safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991); *Rhodes v. Chapman*, 452 U.S. 337,

6  347 (1981).  A prison official is deliberately indifferent when he knows of and disregards a risk

7  of injury or harm that "is not one that today's society chooses to tolerate."  *See Helling v.*

8  *McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  On the other

9  hand, harsh and uncomfortable conditions are expected; convicted prisoners are entitled only to

10  the minimal civilized measure of life's necessities and even inhumane conditions, that is risks so

11  grave even to convicted felons that they are repugnant to those who have consigned the plaintiff

12  to prison, do not amount to punishment if the state actor is powerless to change them or does not

13  know of them.  Plaintiff has not met this standard.

14      His placement in administrative segregation and protective custody in the County Jail

15  was not, of itself, deliberately indifferent to any basic need.  Indeed, as noted above regarding his

16  due process claim, it was adequately justified by a legitimate governmental purpose.  It was

17  based on his criminal history, which could have caused him to be the target of attacks by penal

18  inmates.   Thus, rather than manifesting indifference to his safety, it demonstrated a due regard

19  for his welfare.  Therefore, defendants must be granted summary judgment as to the Eighth

20  Amendment claim.

21      Plaintiff claims that he was deprived of confidentiality with use of the mail and phone.

22  Generally, "prison officials may examine the communications of a prisoner without infringing

23  upon his rights." *United Sates v. Wilson*, 447 F.2d 1, 8 n.4 (9th Cir. 1971).  The Ninth Circuit has

24  held that mail from the courts, as contrasted to mail from a prisoner's lawyer, is not legal mail.

25  *Keenan v. Hall*, 83 F.3d 1083, 1094, *as amended by* 135 F.3d 1318 (9th Cir. 1998) (citing *Martin*

26  *v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987)  ("[W]ith minute and irrelevant exceptions all

1   correspondence from a court to a litigant is a public document, which prison personnel could if
2   they want inspect in the court's files.")).  Because mail to and from the courts is not legal mail,
3   any claim that mail from the courts was not treated in a confidential manner does not state a
4   claim.  *Keenan*, 83 F.3d 1094.  Plaintiff claims simply that his "legal" mail was opened outside
5   his presence and that his regular outgoing mail was returned to him unopened because it had
6   been sealed.  Compl., 27:19-24.  Plaintiff has not established facts that demonstrate that his mail
7   was "legal" or that defendants lacked a legitimate governmental objective in inspecting the mail
8   coming in and going out of the institution.  Therefore, summary judgment is appropriate on this
9   claim as well.

10          Plaintiff claims that he was never allowed access to a telephone where he could speak
11  openly with his family or attorney, because these calls were monitored by jail staff and could be
12  overheard by other inmates in the Pod.  Pl.'s Decl. A, ¶ 35.  Defendants claim that between July
13  2002, and April 2005, telephone calls made or received at the County Jail were not monitored or
14  recorded.  Although there appears to be a dispute in this regard, the dispute is immaterial.

15          The Ninth Circuit discussed the issue of an inmate's right to telephone access in *Valdez v.*
16  *Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002), *cert. denied*, 538 U.S. 1047 (2003), holding that
17  there is no constitutionally protected liberty interest in access to a telephone and no procedural
18  due process violation where the applicable state law merely mandated "reasonable access to a
19  telephone" and gave prison officials discretion to determine what access was reasonable. 302
20  F.3d at 1045.  The court also held that there was no substantive due process violation because the
21  restriction on the detainee's telephone access did not amount to impermissible punishment.  *Id*.
22  at 1045-47.  Thus, assuming plaintiff's version is credited, he has not established a substantive
23  due process violation.  Nor has he shown facts that demonstrate his lack of access to a
24  confidential phone was being done to punish him rather than to serve the legitimate
25  governmental objective of managing jail security.
26  ////

1    Based on the foregoing discussion, summary judgment must be granted in favor of

2    defendants on all of plaintiff's Fourteenth Amendment substantive due process and Eighth

3    Amendment claims.

4         **B. Unreasonable Searches**

5         Plaintiff claims that defendants violated his constitutional rights by subjecting him to

6    strip-searches.  Unreasonable strip-search claims brought by sexual offenders civilly confined

7    under California's SVP Act are properly brought under the Fourth Amendment.  *See Hydrick v.*

8    *Hunter*, 466 F.3d 676 (9th Cir. 2006).  Additionally, an individual detained awaiting civil

9    commitment proceedings is entitled to protections at least as great as those afforded to an

10   individual accused but not convicted of a crime.  *Jones v. Blanas*, 393 F.3d at 932.  Thus, the

11   court looks to case law as it pertains to pretrial detainees.  *Bacon v. Kolender*, 2007 WL 2669541

12   (S.D. Cal. 2007).  The Supreme Court has established a balancing test to evaluate the

13   reasonableness of a such a search.  *Bell*, 441 U.S. at 559.  The test balances the jail's security and

14   penological needs against the pretrial detainee's right to be free from unreasonable searches.  *Id.*

15        Plaintiff first claims that he was strip-searched after his court hearing on July 10, 2002,

16   the day of his arrival at the County Jail for his first period of incarceration at issue in this case.

17   Plaintiff had yet to be officially paroled from Folsom State Prison on that date.  SUF, ¶ 2.  He

18   was still a penal inmate at this time and the right to be free from strip-searches is limited.[11]

19   There simply is no right to privacy in a prison cell, *see Hudson v. Palmer*, 468 U.S. 517, 526

20   (1984), and a prisoner may be subjected to strip-searches and body cavity searches conducted in

21   a reasonable manner.  *See Bell v. Wolfish*, 441 U.S. 520, 561 (1979).  Here, the challenged

22   practice of strip-searching plaintiff must be evaluated under the standard discussed in *Turner v.*

23   *Safley*, 482 U.S. at 89.  The practice is valid "if it is reasonably related to legitimate penological

24

25        [11]  The Fourth Amendment right to be secure against unreasonable searches and seizures "extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context."  *Thompson v. Souza*, 111 F.3d 694, 699 (9th

26   Cir.1997), citing, *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir.1988).

1   interests." *Turner v. Safley*, 482 U.S. at 89.  An adequate basis for the search has been shown

2   here.

3          Defendants have demonstrated a legitimate governmental objective in attempting to

4   control the flow of contraband from a state prison into the jail and plaintiff has not submitted

5   evidence which shows a genuine dispute in that regard.  The jail authorities have a legitimate

6   interest in preventing contraband from entering the jail.  Moreover, merely because plaintiff was

7   being brought to the jail from a correctional facility having its own security procedures did not

8   mean that there could be no concern that he might pose a risk of bringing with him contraband.

9   Defendant Parker testifies in his declaration that he considered the fact that plaintiff was to be

10  exposed to other inmates and staff during his incarceration, as well as his prior convictions for

11  kidnaping and child molestation.  He noted from prior jail experience with such inmates that

12  inmates having a history of violent convictions tend to pose greater risk of bringing into the jail

13  contraband than those with non-violent convictions.  Reasonable suspicion for a jail search can

14  be based on factors that include prior criminal history.  *Way v. County of Ventura*, 445 F.3d

15  1157, 1162 (9th Cir. 2006).

16         Plaintiff alleges that the next strip-search at the County Jail took place on February 24,

17  2004.  He states that he refused the search and asked for his lawyer.  Pl.'s Decl. B, ¶ 88.  At the

18  time of this search, plaintiff was a civil detainee.  The search occurred at 2:30 in the morning and

19  the defendants were not going to wake up his lawyer.  *Id.*, 89.  Plaintiff said he would wait until

20  his lawyer could be present, so defendants placed plaintiff in a holding cell until they could

21  contact his lawyer.  *Id.*, ¶¶ 90, 91.  Plaintiff admits that he later agreed to the strip-search because

22  the holding cell was uncomfortable.  *Id.*, ¶ 91.

23         A touchstone of the legality of any search under the Fourth Amendment is consent.

24  Plaintiff does not claim that his consent was the result of duress.  He only states that he was

25  acutely uncomfortable on the concrete bench in the holding cell.  Here, plaintiff consented to this

26  search and therefore the search did not violate his Fourth Amendment rights, but even if he did

1  not consent, for the reasons stated above, the search was reasonable as it furthered the legitimate

2  government objective of maintaining jail security.

3       The same result pertains to plaintiff's general claim that defendant Yang subjected him to

4  strip-searches.  As discussed above, plaintiff fails to demonstrate that defendants lacked a

5  legitimate governmental objective in performing searches to insure the security of the facility.

6  The court therefore finds that defendants are entitled to summary judgment on this claim.

7       **C.  Restrictions on Free Association and Peaceable Assembly**

8       Plaintiff alleges that defendants' policies, practices, and procedures did not allow him to

9  freely associate and socialize (including association with other civil inmates), which interfered

10  with his First Amendment right under the United States Constitution and his Article 1, Section 2

11  right under the California Constitution.  He generally claims that he should have received "more

12  considerate treatment tha[n] the inmates confined for punishment in the jail, and should have

13  been afforded the same treatment he would face after commitment and placement in Atascadero

14  State Hospital."  Compl., at 23.  He claims that although he was single-celled for the majority of

15  the time he was incarcerated at the jail, he has extensive contact and was in close proximity with

16  other inmates during those times.  Pl.'s Decl. A, ¶ 29; SUF, 65.  He also claims that he was

17  denied pastoral visits by an Elder of his Jehovah's Witness faith.

18       Defendants note that plaintiff's deposition testimony contradicts his allegations by

19  complaining of the contact that he did have with jail inmates and civil detainees, and by

20  testifying that he received personal visits from family and friends.

21       The freedom of association has been described as follows:

22      Our decisions have referred to constitutionally protected "freedom of association"
   in two distinct senses.  In one line of decisions, the Court has concluded that
23      choices to enter into and maintain certain intimate human relationships must be
   secured against undue intrusion by the State because of the role of such
24      relationships in safeguarding the individual freedom that is central to our
   constitutional scheme.  In this respect, freedom of association receives protection
25      as a fundamental element of personal liberty.  In another set of decisions, the
   Court has recognized a right to associate for the purpose of engaging in those
26      activities protected by the First Amendment–speech, assembly, petition for the

redress of grievances, and the exercise of religion.  The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties. The intrinsic and instrumental features of constitutionally protected association may, of course, coincide.

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984).

As to the first line of cases, plaintiff's general claim that defendants did not provide him with "more considerate treatment" than penal inmates at the jail does not implicate the freedom of association protecting certain intimate human relationships.  Further, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (noting that a plaintiff may unwittingly plead himself out of court by alleging facts that preclude recovery).  Plaintiff cannot claim that he had no contact with inmates or civil detainees, while at the same time complain that he had too much contact with inmates and civil detainees.  Furthermore, he has not produced evidence adequate to establish a genuine dispute as to his ability to interact with others consistent with legitimate institutional goals for maintaining security with the jail.

In addition, it is undisputed that while plaintiff was housed in administrative segregation he received the same privileges as all other inmates in administrative segregation.  SUF, ¶ 14.  It is also undisputed that while he was housed in the medical unit, which is more protective than administrative segregation, he received the same privileges as all the other inmates in the medical unit and was given the same dayroom and roof access privileges there as he received in administrative segregation.  SUF, ¶¶ 21, 26, 27.  He was not subjected to a deprivation of his right to freely associate amounting either to a violation of his First Amendment rights or to punishment in violation of his due process rights under the Fourteenth Amendment.

The second line of "freedom of association" cases protects groups whose activities are explicitly stated in the Amendment:  speaking, worshiping and petitioning the government.  *Id.* at 622-623.  Plaintiff claims that he is a Jehovah's Witness and was arbitrarily deprived of

1   pastoral visits with a church Elder, Hank Hanson.  Pl.'s Decl. A, ¶¶ 42-43, 47; Pl.'s Decl. B,

2   ¶¶ 67-68; Pl.'s Decl. C, ¶¶ 22, 23, 28-38 .  However, he testified that he was able to visit often

3   with Mr. Hanson, "during regular scheduled visits with my family."  *Id.*, ¶ 43.  Plaintiff has

4   failed to prove facts demonstrating that defendants deprived him of his right to freedom of are

5   ssociation.

6         Given plaintiff's failure to establish a genuine issue of material fact as to either aspect of

7   a freedom of association claim, the defendants are entitled to summary judgment on this claim.

8         **D.  Restrictions on Access to the Courts and Counsel**

9         Plaintiff claims that defendants interfered with his right of access to the courts by

10  denying him access to the law library, confidential communications with his attorney, and

11  privacy in his legal mail.

12        To prevail, he must prove that he suffered an actual injury.  *Lewis v. Casey*, 518 U.S.

13  343, 351 (1996).  "Actual injury" means a "specific instance in which an inmate was actually

14  denied access to the courts." *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir. 1989).  The right of

15  access is only guaranteed for certain types of nonfrivolous claims regarding a criminal trial or

16  appeal, a habeas proceeding, or a § 1983 case challenging the conditions of confinement.  *Lewis*

17  *v. Casey*, 518 U.S. at 355; *Sands v. Lewis*, 886 F.2d at 1171.  Plaintiff has failed to demonstrate

18  that he was actually injured in the pursuit of a nonfrivolous claim of the nature stated above.

19  Although he references his commitment proceeding and the filing of grievances, he has not

20  shown that he missed a deadline or was prevented from prevailing on an otherwise meritorious

21  claim that was caused either by an inability to use the library or to communicate confidentially

22  with his attorney.[12]

23        Plaintiff complains that defendants interfered with his confidential communications with

24  his attorney by screening his legal mail and other correspondence, and by forcing him to use a

25

26        [12]  Defendants note that plaintiff had no other case pending at the time of his
    incarceration in the County Jail other than his commitment proceeding.  SUF, ¶ 41.

1  monitored, nonconfidential telephone.  Compl., 27:19-24.  An isolated instance or occasional

2  opening of legal mail outside the inmate's presence does not rise to the level of a constitutional

3  violation.  *See Stevenson v. Koskey*, 877 F.2d 1435, 1441 (9th Cir. 1989).  Plaintiff does not

4  indicate that defendants routinely opened his mail.  Defendants state that if plaintiff's legal mail

5  was ever opened without plaintiff being present it was due to inadvertence or because the mail

6  was not labeled properly.  Further, as previously discussed, incoming mail from the courts, as

7  opposed to mail from the prisoner's attorney, for example, is not considered "legal mail." *See*

8  *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996), *amended by* 135 F.3d 1318 (9th Cir. 1998).

9  Plaintiff states that the mail defendants opened was "legal" but does not state or submit any

10  evidence to establish that this was mail from his attorney rather than from the Department of

11  Mental Health, the staff at Atascadero State Hospital, or the court.  Given plaintiff's failure of

12  proof on this claim, defendants are entitled to summary judgment on this issue.

13        The right to confidentiality of communications between an attorney and their client is a

14  vital ingredient to the right of court access.  *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir.

15  1974).  The government violates the right to effective assistance of counsel by interfering in

16  certain ways with the ability of counsel to make independent decisions about how to conduct the

17  defense.  *Perry v. Leeke*, 109 S.Ct. 594, 599 (1989).  A prisoner who has not been completely

18  denied access to his attorney must present facts showing that he has been prejudiced.  *Id.*

19        Plaintiff articulates his belief that his phone calls were monitored, but has not proven that

20  they were, nor has he established that he was deprived of any and all confidential

21  communications with his attorney.  He has also failed to show how this prejudiced him in any

22  way regarding his commitment proceedings or other legal matters, such as regarding facts or

23  elements relating to his commitment that would have made a difference in the outcome.

24        Plaintiff has failed to show that a reasonable trier of fact could conclude in his favor that

25  defendants violated his First Amendment right to access the court or his Sixth Amendment right

26  to confidential communications with counsel.  Therefore, defendants' motion for summary

1    judgment must be granted on these claims.

2        **E.  Fourteenth Amendment Right to Procedural Due Process**

3        Plaintiff claims generally that defendants violated his due process rights under the

4    Fourteenth Amendment by segregating him from the jail's general population, restricting his

5    movement, and depriving him of property.

6        Defendants again rely on *Munoz*.  "The United States Supreme Court has upheld the

7    constitutionality of housing individuals who have been adjudicated SVPs within prison facilities,

8    in segregated housing."  *Munoz*, 208 F.Supp.2d at 1144 (quoting *Seling*, 531 U.S. at 261).  The

9    standard applicable to this claim is rational basis.  The statute under which plaintiff is detained

10   provides, in relevant part, that:

11       Inmates who are held pending civil process under the sexually violent predator laws *shall*
         be held in administrative segregation.  For purposes of this subdivision, administrative
12       segregation means separate and secure housing that does not involve any deprivation of
         privileges other than what is necessary to protect the inmates and staff.
13

14   Cal. Penal Code § 4002 (b) (emphasis added).  Due process requires that this provision rationally

15   relate to a legitimate governmental interest.  The need to house a sexually violent offender in a

16   secure facility is a legitimate state interest.  Moreover, use of the county jail to meet that need is

17   rationally related to this purpose.  Furthermore, for the reasons stated in *Munoz*, segregating the

18   plaintiff in administrative housing or the medical facility did not violate due process.  208

19   F.Supp.2d at 1144.  Accordingly, defendants are therefore entitled to summary judgment on this

20   claim.

21       Plaintiff generally claims that defendants unnecessarily and unreasonably restricted his

22   movement.  He states that he was given 45 minutes of dayroom access per day while housed in

23   administrative segregation.  *Id.*, ¶¶ 31, 32.  However, it is undisputed that all inmates in

24   administrative segregation receive equal time outside their cells in the dayroom and on the roof.

25   SUF, ¶ 12.  As discussed above, defendants have a legitimate governmental objective in the

26   management of the institution and there is no due process violation if the restriction does not

involve any deprivation of privileges other than what is necessary to protect the inmates and staff. Plaintiff has alleged that the restrictions on his movement were unnecessary and unreasonable, but does not prove facts to support this claim. He does not allege that there were periods of time in which jail staff could allow inmates out of their cells without danger of encountering inmates in the general population. He does not adduce evidence indicating that jail scheduling and staffing permitted more than 45 minutes per day for those in administrative segregation to be out of their cells. Rather, he merely complains about the restrictions that are a consequence of being housed in administrative segregation, where defendants are mandated by state law to house him. Accordingly, defendants are entitled to summary judgment on this claim.

Plaintiff also claims that he was deprived of his property without due process of law. He states that he was without his legal documents and that this subjected him to constant questioning by inmates as to why he was in jail. Pl.'s Decl. A, ¶ 21. However, defendants have shown that plaintiff had adequate state remedies available to address the harm alleged. Plaintiff has not demonstrated otherwise. *Parratt v. Taylor*, 451 U.S. 527 (1981) (plaintiff alleging property deprivation by state officials must show inadequate state law remedy). Summary judgment is appropriate for defendants on this claim.

## F. Fourteenth Amendment Right to Equal Protection of the Law

Plaintiff claims that defendants subjected him to more restrictive, punitive and degrading conditions than other detainees in the jail. The "Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). In *Hydrick v. Hunter*, the Ninth Circuit found that an SVP could state a colorable Equal Protection claim by alleging that he was being treated more restrictively than other civilly committed patients. 500 F.3d at 998.

////

1    In support of his claim, plaintiff submits the sworn declaration of Robert Barbour, who

2  claims that he was detained pursuant to Cal. Welf. & Inst. Code § 6600 and housed

3  contemporaneously with plaintiff at the Yuba County Jail.  Mr. Barbour testifies that he has been

4  afforded preferential treatment in the form of extra time out of his cell, clean clothes and bedding

5  in excess of that afforded other inmates housed in the same area with him, and that this is

6  because he volunteers to clean the shower and hallway.  He states that although plaintiff has also

7  cleaned the hallway and shower areas, plaintiff was always denied extra time out of his cell.

8  Although this may demonstrate that Barbour was treated more favorably than plaintiff, both are

9  civil detainees under § 6600.  This fails to demonstrate that detainees under § 6600 are, as a

10  class, denied protections under the law afforded to other inmates.

11    Plaintiff has presented no evidence that SVPs were treated more harshly than other civil

12  detainees.  *Hydrick*, 500 F.3d at 998-99.  Defendants are entitled to summary judgment on this

13  claim.

14    **G.  Double Jeopardy and Ex Post Facto Claims**

15    As previously discussed, the Ninth Circuit held In *Hydrick v. Hunter*, 500 F.3d 978, 993

16  (9th Cir. 2007), that the civil nature of sexually violent predator commitment forecloses

17  challenges based on violations of the Ex Post Facto and Double Jeopardy clauses.  Accordingly,

18  defendants must be granted summary judgment as to these claims.

19  **VI.    CONCLUSION**

20    For the foregoing reasons, it is hereby RECOMMENDED that defendants' May 29,

21  2007, motion for summary judgment be granted.  As claims and defendants remain, the Clerk

22  should be directed not to enter judgment.

23    These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

within the specified time may waive the right to appeal the District Court's order. *Turner v.*

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 26, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE